Mr. Woodward, can you hear me? I can hear you, Your Honor. All right. You may proceed, but I'll ask you to speak up a bit. May it please the Court, my name is Brian Woodward. I'm appearing on behalf of the appellate defendant below, Tanisha Banks. Ms. Banks was charged with and convicted of robbery and conspiracy to rob a U.S. post office located in Gary, Indiana. We are requesting that her conviction be reversed and the matter be remanded for a new trial. There are three issues which we raised in appellate's brief. However, I'd like to address the jury polling issue first, and then perhaps the others if time permits. First of all, I want to acknowledge that the plain error standard of review applies to this case, but in that respect, the Williams case teaches that the primary focus and application of that standard is whether or not juror coercion affected the fairness of the proceedings based upon the totality of the circumstances. And it's the totality of the circumstances, we believe, that entitled Ms. Banks to a new trial in this matter. Now, as it pertains to that issue, I think it's important to recite some of the facts in the Williams case, as well as the Carraway case, both of which are discussed in some detail in both of the parties' briefs. In Williams, the jury deliberated for three hours. It was a one defendant case. And for whatever reason, when the jury was polled, the first juror answered no to the question of whether or not it was that juror's to hear the answer, because the judge went on to poll the rest of the jurors, and it was only after the judge was ready to retire, because he had a civil trial pending, I believe, that a sidebar was called by the parties. And when the judge was informed, no, juror number one did not consent to the verdict, that he re-polled the jurors, to which juror number one again said, no, this isn't my verdict. He then gave them a short instruction, telling them, you have to have a unanimous verdict. Dismissed the jury, and they returned ten minutes later with a note indicating that juror number one had misunderstood the question that was asked when the polling took place. Now, I think it's somewhat significant to note that a different juror wrote the note that said juror number one misunderstood the question, and yet another juror wrote yet a second note that said we have a unanimous verdict. Here, we have a jury that was out four hours. Now, we have two defendants, Mr. Deliberated four hours. Upon returning to the courtroom, juror number 32, who was the fifth juror polled, when asked whether or not this was his verdict, his initial response was forced into. And again, under the totality of the circumstances, we are to determine whether or not the jury verdict was coerced. Now, the court in this instance did give an instruction saying, in essence, use your good faith efforts to try and return a unanimous verdict. Court recessed at 9.07, and we were back in court at 9.35, just 28 short minutes later. Now, the question that we must ask and the approach that the court takes is, you look at this from the juror's perspective. Now, in that respect, we know that the manner of polling matters, and although we cannot and it's forbidden to ask whether or not there is a numerical division, that is, for instance, when there's a hung jury, you can't ask the jurors if they're hung, well, what's the vote? 6-6, 8-2, or 8-4, 11-1, you can't ask that, and that's reversible error. But in effect, that's what happened here, because after juror 32 voiced the fact that he had been forced into a verdict and could not give a straight answer, the district court continued to poll the rest of the jurors. You know, juror number 32's disclosure caught everyone by surprise, I think. Perhaps in juror 32 voiced his concerns, but wasn't the fact that he was the one holdout implicit at that point, given that the written verdict was unanimous? Wouldn't that be implicit, that he was the one holdout? I don't think so, not at all, because obviously, if you have a note that says we have a unanimous verdict, we don't know whether there may have been, let's see who was number 5, so 8 more, we don't know how many more in that sequence may have been coerced also. But once you ask the question, now we know there's only one holdout, so to speak, and he becomes singled out. He is now the singled out juror, and you have to remember, not only was the jury polled as to Ms. Banks, but the jury was also polled as to Mr. Caffey. So in essence, what we have is a 23 to 1 vote, with juror number 32 being the lone holdout, and singled out in the courtroom, in front of all the other jurors, in front of the participants, in front of the court, and in front of the gallery. What else is going on with this trial as a factual matter? How long was the evidentiary phase? I mean, I should say from the beginning of the trial, from jury selection to the jury's decision to deliberate. I think it took two and a half days, if I'm recalling correctly. I think it took two and a half days. Was the jury given a meal since the jury deliberations started right around 5 p.m.? I think they were fed dinner that evening. I believe they were ordered dinner that evening. Okay. Because that was, if I'm not mistaken, that was before the cafeteria in that particular court closed. I think the court cafeteria is closed now, but at that point, I think they were still operating and providing juror meals, because I know they had lunch there. Okay. So that's my recollection. But you have to remember, and it was late at night, so it's 9 o'clock. The jurors had been there since early that day. They thought they had reached a verdict, and apparently they hadn't. And when we look at the totality of the circumstances, and the inquiry is, was the verdict, at least from one juror, coerced? I don't know what else he could have said, other than I was coerced, to say this was a coerced verdict from this juror, because he was forced. He says, I was forced into. And then we also have to look at, in addition to that, not only what he said, but we have to look at the manner in which the questioning took place after he said, I was forced into. And the judge asked again, is this your verdict? His response, wishy-washy, once again, I suppose so. Hardly a declaration of affirmation. Then he's asked again, is it your verdict that she is guilty on both counts, one and two? So he's pressed yet again, after he's already said, I've been forced into this I don't know how to answer that. And then finally, I'm asking you to answer at this time. So he's pressed one further time for an answer. At which point he says, in somewhat exasperation, I feel I need more time. That questioning, in addition to the numerical division having been pointed out, the coercive colloquy, coupled with the fact that Ms. Banks is entitled to a non-coerced verdict, we believe entitles her to a new trial based upon those factors. I might add, at the end of that questioning, it didn't end there. Because at the end, the district court said, basically, I'll come back to you. So here this juror is saying, I was forced into this verdict. And now, after he's been pointed out, and some of the cases talk about the fact that, well, the juror was called out by name. I think that's a distinction without a difference when we talk about jury polling. Because we know it's juror number 32. He's there in court. He's the only one talking. Everyone sees him. So the fact that we no longer call jurors by name, I don't think that's necessarily a consideration when we seek to determine whether or not a juror has been coerced in reaching their decision. Now, the court did say, I believe in a footnote in the Williams case, and in the Carraway case, the court said, look, it's not error per se to continue polling the jury. We know that. But I think Williams tells us, it's the better practice. And that's in footnote three, I believe. It's the better practice or the better approach. I'm sorry, they say it's the wise approach to stop polling at that point. And just to harken back to something that was said, yes, I believe it did take everyone by surprise. Because I can't tell you how many jury trials I've been through, criminal jury trials, and I believe this is the first one where I actually had a juror say, no, this is not my verdict. Normally you'll have acquittal on some counts, you'll have conviction on counts, full conviction, full acquittal. But I've never had a juror come back and just one and say, this is not my verdict. Now, the other point I wanted to make is, as it pertains to what was said, because in all of the other cases, we see that the juror merely responds to the question, is this your verdict? No. Typically the answer is no, it's not my verdict. Well, no can mean a lot of things. No could mean I was coerced. No could mean I just don't agree, I don't think this government's proven their case beyond a reasonable doubt. No could mean a lot of things. But forced into can only mean one thing. And that means I was coerced into voting this way. And the other factor I think is important to point out, the Williams jury returned in 10 minutes with a note saying the juror misunderstood the question. There was some speculation in the decision whether or not that was in fact the case because we can't go behind the jury room doors, so we really don't know. But in this case, we know that the jury came back in less than a half an hour. It was just minutes. Now, if he was forced a half an hour ago, how are we ever to believe that he wasn't forced less than 30 minutes later? Now, we're using 30 minutes or 29 or 28 minutes as the benchmark because that's what the record shows when the jury went out when the jury came back. What we don't know is what transpired in that decision, when the note got to the judge, how long it took the judge to take the bench. It could have been much shorter than that. But if it were, certainly if he were coerced at 9 o'clock, how could he not have been coerced at 925 or 928? I believe that fact and the rapidity with which that verdict was returned is indicative of the fact that Ms. Banks did not receive a fair and impartial trial. You're almost out of time, Mr. Woodward. Would you like to save the rest? I will save the rest of my time for rebuttal. Thank you, Your Honor. Thank you. Mr. Whalen. Thank you, Your Honors. It may please the court. Nathaniel Whalen here on behalf of the United States of America. Chief Judge Sykes, just to answer your questions quickly, this was a five-day trial. So the jurors deliberated on the fifth day. And I believe at transcript page 1271, there's a reference to ordering dinner for the jurors. So they did have dinner there while they're deliberating. I was unsure on that because a dinner was ordered when they started deliberating or only after the judge sent them back after the poll. Yeah. I unfortunately wasn't trial counsel, so I can't answer for sure. But I think typically what the court does is it orders dinner for around a set time. And in this case, there was a pretty substantial amount of time between when the jurors go back and when the exhibits even go back. I don't think there's anything in the record to explain when dinner actually came. But, Your Honors, in terms of the jury coercion, I think, first of all, it's important to know that we're talking about whether there's some judicial action that creates coercion. That's what Williams talks about. That's what Lyle talks about. That's what these other cases talk about. And so the jurors' initial answer coerced into, it might show something about the deliberative process that's going on behind the doors, but that's not the issue for this court. Well, right, except the judge had the choice of either declaring a mistrial at that point or sending the jury back to deliberate. In other words, if you take the juror's, juror number 32's answer at face value, I've been forced into this by my fellow jurors. She's sending him back into the lion's den. Well, and I'm sorry, I didn't mean to interrupt, Your Honor. Yeah, and I think if there was something... Intentional coercion, this is sort of an objective test about whether the atmosphere was coercive and the judge's decision to keep the jurors deliberating and to, number one, after the poll was completed, but actually before that, to complete the poll in the first place, that that combination of factors created unintentionally a coercive environment or added to what the juror was reporting was already a coercive environment, at least if we take the answer at face value. Well, I guess I see the answer slightly differently, Your Honor. It's not I was coerced into by all my other jurors. I'm not sure that there's anything quite so clear as to what the juror is saying. He says none of his answers are clear, frankly, and I think that's why the judge followed up. The word forced into when he's being asked if this is his verdict is pretty dramatic. You're talking to three former trial judges here. We've handled a lot of juries. We're very protective of our juries, and rightly so, to preserve everyone's rights. If a juror says during a poll, I was forced into this, that's a pretty dramatic moment in the courtroom. I absolutely agree with that, Your Honors, and as former trial judges, Your Honors understand that the trial judge is the one there on the scene who's able to kind of evaluate the atmosphere, and that is why this court reviews typically for abusive discretion, but here we are in plain error review, and Judge Springman was the one conducting the questioning of the juror, and I think this court, as it does in these instances, should give deference to the judge's actions right away to try to determine what the juror was actually saying. I think it would have been an interesting issue had she just left forced into hanging in the air as to what she could have done at that point in terms of her options. I think this court would agree that her follow-up questions are neutral. She's not pressuring the juror into asking questions, and when you look at what the other courts of appeals have considered, they do look at the fact as to when the defense attorney objects because the defense attorney, just like the trial court and the government, is there on the ground, and the defense attorney is able to feel whether the juror is being pressed just as clearly as anyone in the room, and I think... Would you not concede, Mr. Whalen, you've been doing this a long time, that it would have been a far better practice after Judge Springman ended her colloquy with juror number 32 for her to call a sidebar immediately and invite a motion for a mistrial? I think, Your Honor, that yes, I would concede that, and I think Judge Springman herself, where she had to do it over again, would probably concede that as well. But we are here on plain error, and so it isn't a question of what's the better practice. It is, as Your Honors know, it's a question of whether it was plainly erroneous for her to continue polling and whether the steps that she took somehow coerced the juror into returning a coerced verdict. And I think the focus on Williams doesn't necessarily do the case law justice. This is a fairly unique circumstance, as Mr. Woodward said, but there are courts of appeals who have dealt with this question of what happens when the juror initially doesn't say that the verdict is their own. And in footnote two of Williams, this court cites opinions from all around the country. We've cited them in our briefs as well. There's the 2nd Circuit, the 3rd Circuit, the 4th Circuit, the 6th Circuit, the 8th Circuit, and the D.C. Circuit. And on those, in those cases, literally all of those cases, on abuse of discretion standard, the court of appeals have affirmed the verdict, and they've made clear, and I kind of want to quote the pentagraph decision out of the 4th, which is in turn no coercion simply because the trial judge continued to pull the jury after the juror disagreed. That isn't the question. The question is whether the totality and fact-specific circumstances of this case show coercion. And in a bunch of those cases, Your Honors, there are follow-up questions to the jurors, some that I would say are probably slightly more pointed than the questions in this case. You know, I would suggest this court go back and read the pentagraph decision, the Amos decision, the Fiorella decisions. Those are cases where the courts engage in a pretty lengthy colloquy with the juror and say, you know, are you returning your verdict as to one defendant, as to one count? What don't you understand? Do you not understand the questions? And questions along those lines. And like I said, the courts have affirmed on an abuse of discretion standard in those cases. So what this court's really looking at and what Williams looked at, is there something more than just the fact that you continue pulling after the juror does not say that's their verdict? Is there something that leads to more coercive atmosphere? And I generally agree with Mr. Woodward's recitation of the Williams facts. And so I'd submit to this court that really where Williams and this case verge paths is after the verdict. Or for a practical matter, no, this isn't my verdict. You have not argued waiver here, have you? We have not argued waiver. That's correct, Your Honor. We've argued that this is plain error because it's a forfeited issue. Yeah. And I think both sides agree this is a forfeited issue. And unlike the Williams case where it's kind of a mixed standard of review, this is straight up plain error across the board. But where this case differs from the Williams case is after that initial response of this isn't my verdict. Because Mr. Woodward's right. What happens after that is the court in Williams dismisses the jurors. And I think you do need to put yourself in the juror's position. So now the judge has told you to go away, the case is over. Then the judge says, no, come on back. And then he singles out the juror again and says, you have to tell me again, this isn't your verdict. He then gives an instruction that says your verdict must be unanimous. The district court's instruction in this case didn't attract Silverin, but it did say you should attempt to reach a unanimous verdict by deliberating in good faith. It is the same practical instruction as Silverin. And the Silverin instruction had already been given in this case. You think we should take into consideration the time of night? It's getting awfully late. Yeah, I think this court should take all the totality of all the facts into consideration, Your Honors, to determine whether there was a plain error in this case. That isn't a fact that I've seen that the other courts take into account. But I think this court has to look at it as a whole and look at whether the judge has then taken steps that somehow coerced the juror into returning the verdict. And I think really one of the key distinguishing cases or factors between this case and Williams is that note that the juror returns in Williams where it's signed by two individuals who are not the holdout. And then the judge comes back in and the juror comes back in and the judge says, hey, dissenting juror, I understand you didn't understand my questions in the first instance. The juror is on the spot. The juror probably has no clue what the judge is talking about because the juror didn't sign the note. So the juror is being, I think, leaned on a little bit by the judge in that particular instance with that question. And the juror, as this court points out, can either say, no, judge, you, the person who's been presiding over this trial, are wrong. I don't know what you're talking about. Or the juror can acquiesce a little bit to the show of authority. Those are all the factors that make this case very different than the case in Williams. And I think this case is really online with the Lyle case, the Pendergraft case, the Fiorella case, the Amos case, the Brooks case, the Gambino case, where it really is a question of the juror says this isn't my verdict. The judge asks some follow-up questions. The judge gives an instruction. And your sister courts across the country have said that that is not necessarily by itself a coercive atmosphere. I think it is the defendant's burden to show that this case is a plain error case and tracks Williams. I think, as both the defense and I have pointed out, there are very key factual circumstances that show how this case differs from Williams. In the Lyle case, Mr. Whelan, the court's instruction, which is basically a silver kind of instruction, was contemporaneous with the returning the jury to the jury room after the lack of unanimity was disclosed. We don't have that here. The court in that case, the district court, went out of its way to say I'm not urging anyone to give up their positions here, make a good faith effort to agree and discuss your disagreements. It was sort of going out of the court's way to guard against coercion or a coercive atmosphere once the lack of unanimity was disclosed. That didn't happen here. Well, I guess I'm a little confused, Your Honor. Are you saying the court didn't instruct immediately when the dissenter, I'll call them, emerged or that the court didn't instruct right before sending the jury back? When she sent the jury back, the judge here asked the follow-up questions of juror number about Ms. Banks and then polled the jury about Mr. Caffey and then came back after deciding to keep them deliberating and didn't give a renewed instruction at that point other than I have to ask you to continue your deliberations. Well, Your Honor, the court said it's more than just I have to ask you to continue your good faith efforts in doing so to attempt to come to unanimous verdict with regard to Ms. Banks. I think that's more than just go back and continue deliberating, Your Honor. I think the good faith reminder in there and attempt to reach a unanimous verdict is telling the jurors, you have to maintain, you know, harken back to the silver in this case. You don't have to return a verdict. I want you to attempt to return a unanimous verdict and I want you to continue deliberating in good faith. You know, it's one thing maybe if the silver in instruction hadn't been given in this case at all, but it was given before the jury begins deliberating so they're aware of the parameters of the law. And, you know, it is worth pointing out that after the instruction is given, the court invites both parties to say, you know, is there anything else the council wishes to add to the record with regard to the court's directive to the jury? So at that point, if the instruction again was coercive, the people in the courtroom in the atmosphere at that moment could have said, you know, Judge, I'm not sure your instruction at this point is really enough. You should maybe give the silver an instruction. And I do think the standard of review does matter here to some extent, Your Honors, because the question is, does this court looking at the record see that there's a clear and obvious error such that everyone in the room, defense attorney, prosecutor, judge, before sending the jury back should have said, oh, no, no, no, hold on. There's something seriously wrong here. There's something problematic. This is going to result in a coerced verdict. And I just don't think the record reaches the level of that. And, you know, frankly, if it had, I think there probably would have been a motion for a mistrial at some point. There wasn't a motion for a mistrial. And that is a key distinguishing factor between this case and the other cases. Your Honor, I see my time's wrapping up. And unless this court has any questions about that issue or the other issues, we would just ask that you affirm the judgment below. Thank you. Thank you. Mr. Woodward. Just briefly, Your Honor, I don't believe any of the cases cited by the government involve a juror who responded to a question in the nature of, I was forced, I was coerced, I was threatened. Anything of that nature. None of those cases. And therefore, they're all distinguishable on that basis alone. I wanted to follow up on the length of the trial. Although it was a five-day trial, as I recall, we had extremely inclement, there were two things going on. We had extremely inclement weather during a couple of those days, which required abbreviated days and the late starting. And as I also recall, there were issues with GSA providing heat to the building. And I'd have to go back and check the transcript to verify that. But I recall there being issues with heat in the building because we couldn't get it up to the proper temperature. Mr. Woodward, this is Judge Flom, with respect. Are you asking us to take into consideration the weather as a factor in this case? I think the weather, when we consider the totality of the circumstances, when you're considering jurors at 9 o'clock at night in January, who have been through five days of trial and are wanting to get home to their families, I think that is a relevant consideration for the court to consider. Now, I'm not sure that's part of the record, so we really couldn't... No, no, I'm not questioning that. I'm more concerned, since we're under plain error, about the atmospherics, which you and Mr. Whelan have spoken of. And... I'm sorry. People who were there, that is, defense counsel, prosecutor, and trial judge. Had a sense of how dramatic the word forced into was. I have no sense of that. You have a sense of it. The district judge had a sense of it. The prosecutor had a sense of it. I'm not asking for testimony here today, but it strikes me, if there was a dramatic statement to the effect forced into, which caused eyebrows and other concerns to appear, that we would have had a different reaction, aside from the plain error standard. I just don't quite understand why, collectively, there wasn't a reaction to forced into. Because as the dialogue continues, the juror number 32 says, well, I suppose so. I don't know whether that ameliorates the forced into. And then, when further question, juror 32 says, I don't know how to answer it. So, I don't know whether that speaks to confusion versus coercion. So, when we're left with that, and we're under this plain error review, what are we to make of, admittedly, a inquiry that could have been better handled by the district judge? I'm not questioning that. But it's very difficult to get a sense, for me, for the record, that a word forced into should be totally controlling against the backdrop of the participants who had a word to say, or an opportunity to say, something about how important forced into was. And I'm not trying to minimize the language of forced into. I appreciate your argument in that. So, can you tell me why, in your judgment, there wasn't a more collective response from the critical participants, counsel, the judge, or the prosecutor? Yes, I think I can answer that, Your Honor. Two things. Number one, I think everyone, as Judge Sykes intimated, was more or less in awe, because this is a situation that doesn't, not only does it not frequently arise, but it probably rarely arises, if at all. And so... Well, to that point, that's my... If it is so strikingly unusual, why did we have sort of a moderated procedure post the unusual state? I think everyone was trying to determine, probably in their own minds, how do we deal with this situation? What is the next step? One of your comments that were forced into this verdict, what do we do? And in hindsight, yes, we can go back and be Monday morning quarterbacks and probably get it right. But in this particular case, no one got it right. No one. The district court didn't get it right. Defense counsel didn't get it right. And so that's why we believe that Ms. Banks is entitled to a new trial. All right, thank you, Mr. Moore. Thank you, Your Honor. All right, thank you. Any further questions from the panel? Judge Rovner, I saw you were having some video difficulties, but could you still hear us? I am having difficulties. I'm running out of power and we don't understand why. Okay, well, we'll get that corrected. But for these attorneys, before we move on, do you have any further questions for them? No. Thank you. Thank you very much. Our thanks to both counsel. The case is taken under advisory.